Thank you, Your Honor. If it may please the Court, Wayne Fricke, appearing on behalf of James Barber in this case. I will say, for purposes of travel today, getting from Tacoma made me a bit nervous, with the I-5 shutdown in total underneath the convention center, backing up all the way to Federal Way. So anyway, that said, people from D.C. maybe on this day had better travel arrangements. But you made it. I did make it, and I made it before this time, so thank you. Your Honors, again, if it may please the Court, I think this case, with a lot of background that occurred at Mount Rainier and Paradise Water Treatment Facility, is really a simple case as far as the issues go and what I believe impacted the defense in this case, and it was the inability to get an instruction on entrapment by estoppel. The situation is you had James Barber, who is a defendant here, convicted of the Clean Water Act violation, a felony conviction, I think is undisputed by the testimony, was there for several years. He was working under various individuals, specifically an individual who had retired, Mr. Ben Morrison, who was the utility systems repair operator within the park for these facilities. He received training from that individual as well as other individuals regarding all of these treatment plants. This case, again, specifically deals with what's known as the Paradise Treatment Facility. And part of that training is, in certain situations that are described, it could be mechanical, electrical, biological, but part of the training is there may be times when a bypass is necessary in operating this plant. Now, there's three portions of the treatment system. You have the primary, then the secondary, and then it's called the tertiary, which is what is at issue here. And when the plant is going through difficult times, whether it's negligence, whether something else is going on, the park, through the training, had implemented a procedure where you bypass this tertiary, and the bypass over the history of this plant might last a couple hours, it might last days, and I think there is testimony in the evidence that at one point in time leading up to this tragic weekend, it went on for a month. And during that history, no one was ever charged, no one was ever prosecuted. This particular weekend, Mr. Barber was operating the plant as he had been the entire summer, and as you can see from the record, there were some difficulties with that plant. I don't think the record suggests that it was intentional. I think he was simply overwhelmed with the responsibilities taken into consideration, the other plants he was responsible for. And it got out of hand, and that week he had called for help. Specifically, he had called for trucks to come and pump it out, and they sent one partially filled, so it didn't do the job. And so he's there on his normal rotation on this Friday, does what he's trained to do, sees the problem again developing. He opens the valves, and turning the valve is intentional. You have to get up on a platform, in essence. I mean, you have to make the effort to turn this valve. And he did that. And again, he did that consistent with the training. Counsel, let me ask you a question. Is there any record that Mr. Barber made a record when he turned the valve? Like, you know, some form. Or the logbook. In the logbook. He says, I'm opening the bypass to solve such and such a problem. If I don't do it, you know, the tertiary tank will explode. You know, whatever the reason was, did he make any entry that would suggest he had a legitimate governmental or business reason? The short answer is no, Your Honor. Okay. The short answer is no. So if he didn't, then what's his defense on the basic charge? Well, the basic charge, the defense is that, again, based on the training, well, I should say what the defense we attempted to have. I realize the issues you're raising, he didn't get an instruction on equitable stop. Right. But just as one judge speaking, I thought that the guy who trained him had said you can open the valve and, you know, it's a last resort or something like that. I think that would be fair characterization as a last resort depending on what the situation was. And I think notwithstanding the fact that there's nothing in the record, and I think the government used that along with what happened that summer to demonstrate his motive for doing this intentionally. And, in fact, in their brief they said the government's position was solely based on the fact that he opened the valves. And it really wasn't based on what happened afterwards.  Well, didn't they also say that he was only trained to do that as a last resort and that he was trained that he'd have to communicate with coworkers via the logbook or otherwise? Well, definitely he was trained, and there was testimony in the record that, at least up until that point in time, that, I mean, some people had substantial information contained within the logbook. Others were just very brief. And so there were some individuals that testified that he did poor record collecting. Did he make any notice of turning on the valve? He did nothing. Okay. And I don't think, and all that's accurate, I don't think that goes to his ability to have a defense as to this entrapment by estoppel. It does go to his, the failure to communicate certainly goes to the inability to find out what was going on that weekend. But I will say this, you know, Dan Anderson, who was his coworker at the time, less experienced, but then Mr. Barber was less experienced than his others, he comes in there on Saturday and he goes into the treatment facility. He sees what's going on, and at that time there really is nothing that sticks out. The suspended solids were basically identical to what they had been the entire month of August. And he leaves and doesn't see anything out of the ordinary, but certainly he was there. He comes back on Sunday, basically less than 48 hours later from Friday when Mr. Barber left, and then that's when everything hit the fan, basically. You know, sometime when he left on Saturday to when he arrived on Sunday, it was a total disaster as far as the sewage leaking out. But how do you get to an entrapment by estoppel if his training required that this would have to be a last resort and he would have to communicate? Well, let's first of all, certainly communication is important, but the fact that he didn't communicate and he forgot when he's leaving the plant and he forgot to write it in the log book, that doesn't take the defense out from underneath him. Okay, so your response is that he forgot. Yes. Okay, that he was trained to do that but he forgot. He forgot to enter in the log. Okay, so why was this a last resort? The last resort was, well, as everyone, and I'm not sure, the last resort was used in different contexts, but in this case, the situation was where, as he gave in his statement, they were having trouble with the settling all summer long, and then he tried to get the truck to pump it out, to clean it out, and they didn't get there, and it was just basically clogged up. And so he felt that he was forced, and I didn't use those words in his interview, but he opened it up, he was trained to do so, and he did it. On this day, did he call for trucks? He did not call for trucks. He had called for trucks that week, and as indicated, one came partially filled up and wasn't able to do the job. But I think the fact of the matter is, you know, it's one thing to be able to allow the government to argue, if we got the instruction, well, his training was, it's the last resort, this clearly wasn't the last resort, and I think that goes to the weight of the evidence and argument, but, again, it doesn't go to the ability to get the instruction itself. Because all the instruction, the cases in this circuit say, is that an authorized government official empowered to render the claimed advice, and I don't think, well, there is a dispute, and there is the legal question. The government says it had to be an individual from the EPA to give this advice, and I don't think there's anything in the cases to suggest that that's the case. And when this doctrine, I think, initially came up by the United States Supreme Court, they talked about it where a person is affirmatively misled by the responsible agency, and I think the responsible agency here was the National Park Service and specifically Rainier Park and the individuals that worked under the park at that time, and, again, specifically Ben Morrison. But when you go down the elements that need to be demonstrated to get that instruction, all of that is applicable here, and I would suggest the only reason the government puts forward as the reason not to get the instruction is that they don't believe Ben Morrison or the other individuals who had the equivalent position at the National Park Service, he didn't have the ability to rely on those individuals. That's their position. And our position, of course, is that, in fact, he could rely on them. In fact, it doesn't make anything other than logical sense that a person who is a worker in the park service and is doing this type of work would not rely on his supervisors who are responsible for his training. I mean, it doesn't make sense that he has to go to another agency in its entirety or up the chain of command. These are the people who train him. I think they do argue that, but don't they also argue that the record doesn't support that such an instruction was appropriate or had to be given? I think they do argue that there wasn't enough information, but it's based, as I understand the argument, based solely on the position that EPA did not give the authorization. And that's what they presented when we were arguing for instructions in the pretrial motions to dismiss. And then here on appeal in their brief, basically in many different ways, it says the same thing. It's got to be EPA. It's got to be EPA. Ben Morrison was an EPA. Okay. Mr. Fricke, you've got three and a half minutes. And I will reserve those for rebuttal. Reserve for rebuttal because Ms. Bruner, I'm sure, will lay some points out from their perspective and get the benefit of that in responding. Sure. Thank you. Good afternoon, Your Honors. For the record, my name is Helen Bruner. I'm here to represent the United States. Let me go immediately to the question of the entrapment by estoppel argument. Rather than starting with the legal argument that we did make, let me just go to the factual issues. And I think as a factual matter, the instruction was not called for here because the record didn't support the instruction. First of all, the testimony at trial from Mr. Morrison, the operator who was perhaps the one most involved in Mr. Barber's training, was that the use of the bypass was to be used as a last resort, and that's a quote from SCR 198, an emergency situation to open it. That's what he described it as. He described it in the following page at 199 as basically an emergency type thing. And one question he was asked as well during the trial was whether he provided specific examples of what an emergency bypass would have been to Mr. Barber. He said he doesn't recall that he ever had that conversation with him. Mr. Barber also didn't testify at trial, so at most what we have are testimony regarding the statements that he made to an agent after the event. And I would point simply to SCR 651, where he noted that he was not aware of any other bypasses happening at the plant while he was there. So what we have is a record of trying to rely on someone who has told him that this is for an emergency situation. We have no record of what really he thought was the emergency here, and nothing that would suggest as a factual matter that he was instructed that under this type of circumstance that he could do this. So as a factual matter, the defense has not satisfied the elements for an entrapment by estopolis defense, which require authorization by a government official empowered to render that erroneous advice, which we would take issue with the other operator being that person. But in any event, that person needs to be aware of all the relevant historic facts, affirmatively tell the defendant that his conduct at issue was permissible, and that the defendant relied on that insurance and that reliance was reasonable. And under these circumstances, we're not there. In a criminal case, reliance would require him to testify. Exactly, Your Honor. That's not contrary to constitutional principles, right? No, it's not, because it is an affirmative defense in this circumstance. Why would he have had to testify? He could have logged the situation as well. There's no entry in the logbook, right? No, that's right. I mean, I would say under the... He called a co-worker or a supervisor to ask for help. I don't think there's any indication he did that that day. He did not do that. He did not call anyone else. He did not put anything in the logbook. And to answer the Court's question, I think had he done that, perhaps the record could have been more complete without his testimony, but in the absence of any entry in the logbook, he did not call someone else who was a plant operator. He could have called one of the other plant operators for advice. He could have called his supervisor. He could have called for more trucks. I think in that instance as well, there's at SER, just a side note, at SER 598, his supervisor testified, actually, that there was more than one truck that came. One came half full and one came later. Absolutely. Go ahead, Judge Christin. Well, I didn't want to dissuade you from Judge Block's question. I think Judge Block's really getting at the fact that none of those things happened, so there wasn't any of that evidence prior to this incident, this very unfortunate incident. And so given that, is Judge Block right that he would have had to testify to raise this issue? I think so. I think so in that without that factual record, there was no basis for the District Court to give that instruction. It needed to be a basis in law and a basis in fact. That's not a waiver of any constitutional right of his? That doesn't compromise the Fifth Amendment, I guess? It does not. He had a choice to do that. Let me just ask one other question, because as I read the statute, you know, it's knowingly turning the valve, right? And where do you draw the line? Because the statute on its face says that anybody who knowingly turns the valve off is guilty of a crime. How do you know who to prosecute? Well, Your Honor, I think what the statute requires is a knowing discharge of a pollutant from a point source. So you not only have to knowingly turn the valve, you have to know that the pollutants are going out. That's not uncommon, is it? I mean, coming from Brooklyn, I don't have a good feel for this, you know? But we have a lot of pollutants in Brooklyn, too. There's a bad joke in there somewhere, but anyway. I just think this is not uncommon where the valve are turned off and pollutants do come into the ecosystem, I guess. So he's not the first person to have done this, I imagine, right? No. And if Your Honor's question is how do we decide in the context of this case, I think what, as a matter of prosecutorial discretion here, what you're looking at is a situation which was highly, highly, highly unusual. You had sewage sludge basically going untreated out the outfall of this plant. Is it that or is it that it went on for three days, that he left without communicating? I think it's a combination of all of those factors taken together. If he had communicated that, if he had logged it, perhaps another operator would have clued into this and concluded that there was a problem. Had he communicated he had a problem with the plant, it would have perhaps brought other people out there. In fact, the record shows that in July, because of concerns about the operation of the plant, another operator spent a couple days there, gave him a number of suggestions through his supervisor as to how he could better manage that plant. What did the jury hear about when this was finally discovered, what was done? Did the jury hear about that? They heard some of what was done. Obviously, the plant needed to be righted and needed to be... I mean, in other words, it's not a trick question. Were they able to sort of shut the valve back off immediately, or was it a longer-term fix? I'm trying to figure out what could have been done. Well, I think, and I'm certainly not, although I've spent some time reading the record and spent some time actually prosecuting these cases before, but I'm definitely not a technical expert. But what they needed to do was clean out the sludges. I'm just asking what the jury heard. I think the jury heard... When those people showed up, what'd they do? What they did was first investigated what was going on and then how to first shut down the bypass. They had a problem, obviously. They had to clean out the plant in order for it to run properly and then allow it to... I believe they got some tanks, pumper trucks out there, and some other things. So if he had remembered, if he had turned this thing on, and you've just conceded, I think, vis-à-vis your answer to Judge Block's question, that sometimes the switch has to be flipped, the valve has to be opened, if he had remembered, could he have done something to right the situation? Did the jury hear that? Well, we would take issue with any suggestion that he didn't remember, but in any event, had he come out and righted the situation, perhaps worked on the plant, fixed the AWT, cleaned the filters, asked for help, maybe found a way to add polymers or something else than there was testimony about polymers being used to help the settling in the plant, gotten help, he might have been able to right the situation. Counsel, let me ask you a question. Does the record show that on the Friday when he opened the valve for the bypass that there existed an emergency situation which would justify using a bypass? No, Your Honor. What the record does show is that he took a sample before he left the plant, that the sample of total suspended solids was at 25 milligrams per liter, which exceeded the parameter in the letter that EPA had provided to them about their operating parameters. But other than that, there wasn't any detail anywhere in the log that would suggest that this was an emergency situation where a bypass was necessary or that some sort of equipment malfunction was happening and this was the only solution. No one knows why this happened? It's some sort of a mystery? Your Honor, I think that the government's position at trial was that  he had not taken the corrective action that had been suggested to him by Mr. Gibson. As Mr. Gibson testified, he had provided a number of recommendations. This was provided to him by Mr. Fuller, and that as a result the situation at the plant was deteriorating. I guess I just don't understand why he would do it, but I'm really hardly an expert in this area. Well, there's nothing in the record that would provide us with a complete answer. Did the government argue to the jury that there was a reason why he did it? Well, the government's argument or supposition, if you will, was that he had a plant that was deteriorating. In the briefs that the government argued that he did it to clean the plant, enough fell swoop at the expense of the river. Exactly, Your Honor. That was the government's position. It's only a question of inference. Exactly, Your Honor. In terms of the state of the plant, at the time he opened the valve, you're saying it wasn't an emergency then that would have justified it? No. It wouldn't have necessarily justified it. No. The testimony at trial, I think, provides examples of when emergency situations had occurred. For example, Mr. Morrison testified about a winter situation where the plant was overrun by water because of the rain. Other testimony by both, I believe Mr. Morrison testified about one other bypass. Ms. Jarrah testified about two or three where a piece of equipment needed to be taken offline because they needed to get the operator out there. Did Mr. Barber have any expert who submitted testimony that the circumstances at the plant objectively warranted opening the bypass even though he didn't log it or record it or tell anyone? I don't believe so, Your Honor. Counsel, did the jury hear testimony that even resorting to this drastic measure that the procedure would be to open the chlorine treatment to the outflow, that that would be the way to do this procedure? They heard testimony that if you were going to bypass the tertiary part of the plant, that you would have to move the chlorine line from its normal location to the port in the bypass line so that you would still add the chlorine to disinfect the— Some treatment. Yes. Okay, and that was my question. So they heard that testimony that if you're going to do the bypass, that would be the way to do it. And was there testimony about whether he did that? There was testimony to the contrary, that he had not done that. Okay. So the chlorine line had not been moved. And what happens when you bypass is it runs through, obviously, the primary and secondary treatment, assuming that process is working properly, which is why in other circumstances, if those two portions of the plant are working properly and you apply the chlorine,  but if the plant is in a situation where there's too much sludge moving through, there was testimony to that, then that's going to start to go out the bypass. Thank you. Okay, thank you. If the Court has no other questions for me, then I will ask the Court to affirm the conviction. Hearing none from my colleagues, I think we can thank you and let Mr. Fricke have his rebuttal. Thank you, Your Honor. I would agree that the testimony did indicate that it was a deteriorating situation. You know, I think whether one, whether it was Morrison, Fuller, or Gibson, or someone would classify it as an emergency situation, that goes to the weight and that goes to argument at that time. It doesn't go to whether he's entitled or not entitled to the instruction. And your answer, Your Honor, excuse me, in answer to your question, the first thing he did was close the valve. I mean, you walk in there, valve's open, you close it. And there was a phone conversation, or actually a message left by Mr. Anderson, like I mentioned, who came in the next day, saw something wrong, and called Shelly Darra. She denies it, but he testified, called her, and she didn't come up. I mean, so the situation, as bad as it was, it could have been stopped at least 24 hours earlier had she come up at that time. And the reason he called her was because she apparently was the person on duty that weekend, and that was why she made, no one called Mr. Barber. Mr. Anderson didn't call Barber. He wasn't there for the weekend. Am I misunderstanding this part of the testimony that they're saying that if they resort to this procedure that's the last resort, they're supposed to move the chlorine line? That is accurate, that that was part of the testimony, that if you're going to do this, you do this in a certain way. But again, that goes to his competence. And as you have in this record by several individuals, he was in over his head. He didn't know what he was doing. He was overwhelmed. They should have two people up there. Morrison's retiring. He said, this is a disaster waiting to happen. The disaster happened. And, you know, the government did have their arguments, their inferences, and said it was some motivation, some untoward thing that he was deliberately doing this. But the reality is it wasn't. He had a person who shouldn't have been there alone, and he was doing the best he could under the circumstances. And did he make mistakes? Absolutely he made mistakes. Did he not communicate certainly that weekend? He did not. But it was observable, and so it could have been corrected by the next person who walked in there before it hit this level. And, yes, the standard on this EPA letter, such as it is, and that's a whole other fiasco as far as why this plant's even in operation, said the suspended solids shouldn't be above 20. But when you look at the exhibits, that whole summer they were above 20 for the most part, certainly in the month of August. And the health person came there, looked at it on the weekend in mid-August, and it was always above 20, so it's a little bit high, but no major problem at that time is what he saw and made some suggestions. And he tried to follow those suggestions. Obviously he didn't do it very well. So, Your Honors, again, it's a matter of whether he should at least have the opportunity to argue to the jury that he was following the instructions, even if he didn't do it perfectly. That's not the issue. That's an argument the government would make to the jury is that he didn't follow instructions, and therefore you shouldn't give him the defense. But that's argument. That's not the legal standard, Your Honor. Thank you. Thank you, Mr. Fricke, and we'll thank Ms. Brunner as well. And the United States v. Barber is submitted. And the Court will adjourn or continue hearings until tomorrow.
judges: Block, Gould, Christen